**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SAN DIEGO NAVY BROADWAY
COMPLEX COALITION,
                *Plaintiff-Appellant*,

      v.

UNITED STATES DEPARTMENT OF
DEFENSE; ROBERT M. GATES, in his
official capacity as Secretary of the
U.S. Department of Defense;
UNITED STATES DEPARTMENT OF
THE NAVY; RAY MABUS, in his
official capacity as Secretary of the
U.S. Department of the Navy;
NAVAL FACILITIES ENGINEERING
COMMAND; CHRISTOPHER J.
MOSSEY, in his official capacity as
Commander of the Naval Facilities
Engineering Command; NAVAL
FACILITIES ENGINEERING COMMAND
SOUTHWEST; S. KEITH HAMILTON, in
his official capacity as Commander
of the Naval Facilities Engineering
Command Southwest,
                *Defendants-Appellees*.

No. 12-57234

D.C. No.
3:11-cv-00154-
JM-WMC

OPINION

Appeal from the United States District Court
for the Southern District of California
Jeffrey T. Miller, Senior District Judge, Presiding

Argued and Submitted
February 5, 2015—Pasadena, California

Filed March 30, 2016

Before: Harry Pregerson and Jacqueline H. Nguyen, Circuit
Judges and James G. Carr,[*] Senior District Judge.

Opinion by Judge Pregerson;
Dissent by Judge Carr

## SUMMARY[**]

### Environmental Law

The panel affirmed the district court's summary judgment
in favor of federal defendants, and denial of the San Diego
Navy Broadway Complex Coalition's motion for summary
judgment, in the Coalition's challenge to the issuance of a
2009 Finding Of No Significant Impact based on a 2009
Environmental Assessment for redevelopment of a four-block

---

[*] The Honorable James G. Carr, Senior District Judge for the U.S.
District Court for the Northern District of Ohio, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has
been prepared by court staff for the convenience of the reader.

site owned by the United States Navy in downtown San Diego.

The panel held that the federal defendants fulfilled their obligations under the National Environmental Policy Act. The panel held that *San Luis Obispo Mothers for Peace v. Nuclear Regulatory Commission*, 449 F.3d 1016 (9th Cir. 2006), required the federal defendants to address the environmental consequences of a possible terrorist attack on the Navy Broadway Complex. Specifically, the panel held that the Navy considered the relevant factors in its "hard look" at potential terrorism at the Navy Broadway Complex. The panel also held that the federal defendants did not abuse their discretion in determining that there was no significant impact from the possible environmental effects of potential terrorism at the Navy Broadway Complex, and a Supplemental Environmental Impact Statement was not required.

District Judge Carr dissented from the majority's determination that the federal defendants adequately addressed the environmental consequences of a possible terrorist attack on the Navy Broadway Complex.

---

**COUNSEL**

Corey J. Briggs (argued) and Mekaela Gladden, Briggs Law Corporation, Upland, California, for Plaintiff-Appellant.

Allen M. Brabender (argued) and Ignacia S. Moreno, Assistant Attorney General, United States Department of Justice, Environmental & Natural Resources Division, Washington, D.C., for Defendants-Appellees.

Allen Scott Andrews, San Diego, California, for Amicus Curiae Pro Se.

John McNab, San Diego, California, for Amicus Curiae Pro Se.

**OPINION**

PREGERSON, Circuit Judge:

The San Diego Navy Broadway Complex Coalition ("the Coalition"), a San Diego civic group, appeals a summary judgment ruling in favor of the United States Department of Defense and various other named defendants (collectively, "Federal Defendants"), as well as the denial of the Coalition's motion for summary judgment against the Federal Defendants. The Coalition challenges the issuance of a 2009 Finding Of No Significant Impact based on a 2009 Environmental Assessment for redevelopment of a four-block site owned by the United States Navy in downtown San Diego. The Coalition argues that the district court erred in granting summary judgment in favor of the Federal Defendants, insisting that the Federal Defendants violated the National Environmental Policy Act ("NEPA") by failing to produce a Supplemental Environmental Impact Statement that addressed a potential terrorist attack at the redeveloped military and civilian facilities near the San Diego waterfront. We affirm the district court's decision.

**FACTUAL AND PROCEDURAL BACKGROUND**

**A. The San Diego Navy Broadway Complex**

The San Diego Navy Broadway Complex ("Navy Broadway Complex") is a fifteen-acre waterfront site located adjacent to downtown San Diego, California. The site currently serves as the home to several non-operational, administrative components of the United States Navy. The current on-site Navy facilities were built more than seven decades ago.

In 1982, the Navy began considering options for consolidation of various Navy installations in the San Diego area. Because of budget constraints, the Navy pursued a "co-location" program in which the federal government retained title to property and leased portions of the property for private revenue-generating uses that would offset the cost of new administrative facilities. Congress enacted legislation in 1986 that authorized the Secretary of the Navy to pursue a public-private venture to implement the co-location concept at the Navy Broadway Complex site. *See* National Defense Authorization Act for Fiscal Year 1987, Pub. L. 99-661, § 2732, 100 Stat. 3816 (1986).

In June 1987, the Navy and the City of San Diego ("City") executed a Memorandum of Understanding to establish the terms of potential future development on the Navy Broadway Complex site. To comply with its environmental obligations under NEPA, the Navy completed an Environmental Impact Statement ("EIS") in 1990 and issued a Record of Decision in July 1991. The EIS evaluated six action alternatives, in addition to the no-action alternative, and discussed a full range of environmental issues. The

Record of Decision memorialized the Navy's decision to redevelop the Navy Broadway Complex site and identified essential uses for the site. The Navy Broadway Complex would expand from 861,000 square feet of Navy office, warehouse, and industrial space to 3.25 million square feet of mixed military and civilian facilities, including hotels, retail, and entertainment spaces.

The Record of Decision directed that the next step was for the Navy and the City to enter into a development agreement, as contemplated under the 1987 Memorandum of Understanding. Negotiations and state litigation followed, including consultation and issuance of a consistency determination from the California Coastal Commission to ensure the Navy Broadway Complex was consistent, to the extent possible, with the state's coastal zone management.

Following public review, on November 2, 1992, the City enacted an ordinance approving the Development Agreement for the Navy Broadway Complex. The Development Agreement incorporated a development plan, urban design guidelines, and provided a guide to the planning and approval process for the project. The Development Agreement also included environmental mitigation measures that were consistent with the 1990 EIS. However, adverse San Diego real estate conditions in the early 1990s caused the Navy and City to delay project implementation.

**B. The 2006 Environmental Assessment**

As the real estate market in San Diego improved in the mid-2000s, the Navy took steps to implement the

Development Agreement.[1]  To facilitate implementation of the Development Agreement, and in consideration of the amount of time that had passed since the 1990 EIS, the Navy completed an Environmental Assessment under NEPA in 2006 that analyzed the environmental impacts associated with implementing the 1991 Record of Decision and the 1992 Development Agreement ("2006 EA").  As part of the 2006 EA process, as well as a means to re-introduce the development plan to the public, five public hearings took place beginning in April 2006.  The Navy considered the resulting public comments in its NEPA analysis.

In late 2006, the Navy published a notice that the 2006 EA was available for public viewing and issued a 2006 Finding of No Significant Impact for the Navy Broadway Complex's development.  A private development partner, Manchester Pacific Gateway, LLC, signed a lease in November 2006 after the issuance of the 2006 Finding of No Significant Impact.

In January 2007, the Coalition, a citizens' group purporting to represent San Diego residents, filed a lawsuit alleging, among other claims, that the Navy failed to comply with NEPA's public notice and participation provisions prior to issuing the 2006 EA and 2006 Finding of No Significant Impact.  The district court agreed that the administrative record was insufficient to demonstrate that the Navy gave proper public notice of its intent to prepare the 2006 EA and Finding of No Significant Impact.  The district court granted

---

[1] In 2005, the federal Base Realignment and Closure Commission issued a directive to the Navy to either implement the Development Agreement or close the Navy Broadway Complex and relocate the commands to other bases in San Diego, thereby adding urgency to the redevelopment effort.

partial summary judgment in favor of the Coalition and instructed the Navy to address the insufficiency.

## C. The 2009 Environmental Assessment

The Navy produced a new draft EA on September 17, 2008 and widely publicized the draft EA's public availability. Three public hearings were held in September and October 2008. In March 2009, the Navy issued a finalized EA ("2009 EA"). The 2009 EA incorporated updated conditions in San Diego and examined the Navy Broadway Complex's potential as a terrorism target. The Navy found that "[b]ased on current threat reporting, there is no known specific threat targeting" the Navy Broadway Complex. The 2009 EA concluded that the risk of terrorism was "too speculative, remote, and removed from the environmental effects of the proposed action to merit further analysis under NEPA." The Navy altered the final 2009 EA to include its response to public comments about terrorism in the draft EA.

After finalizing the 2009 EA, the Navy issued a 2009 Finding of No Significant Impact, concluding that no changed or unexplored circumstances required a new or Supplemental EIS before the Navy proceeded with redevelopment of the Navy Broadway Complex.

On January 25, 2011, the Coalition again filed suit in federal district court challenging the redevelopment of the Navy Broadway Complex on several grounds. One such ground was the Navy's alleged failure to prepare a Supplemental EIS that adequately examined the potential environmental impact of a terrorist attack at the Navy

Broadway Complex.**²**    Both parties moved for summary judgment.

The district court granted the Navy's motion for summary judgment on all claims.  Addressing the claim that the Navy failed to adequately consider the potential environmental impact of a terrorist attack, the district court stated that "the Navy took a hard look at the environmental consequences of potential terrorist attacks and adopted standards to address potential terrorist concerns."  The court further remarked that since "the same naval administrative services that are currently located on the [Complex] site will remain after construction of the project . . . the potential terrorist threat remains essentially the same, except that the administrative services will be located in modern, improved, and higher security facilities."  The district court entered final judgment for the Navy on October 17, 2012.  The Coalition timely appealed.

## DISCUSSION

### A.  National Environmental Policy Act

NEPA creates a "national policy [to] encourage productive and enjoyable harmony between man and his environment."  *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 756 (2004) (quoting 42 U.S.C. § 4321).  NEPA was

---

**²** Before the district court, the Coalition claimed that: (1) the Federal Defendants failed to adequately consider alternatives under NEPA; (2) the Federal Defendants failed to prepare a Supplemental EIS based on alleged significant new circumstances and information relating to terrorism, climate change, seismic hazards, traffic impacts, excessive development, and cumulative impacts; and (3) the Federal Defendants violated NEPA by prejudicing the outcome of the NEPA process.

designed to minimize environmental damage and to promote "the understanding of the ecological systems and natural resources important to" the United States. *Id.* The Supreme Court described NEPA's "twin aims" as "plac[ing] upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action[, and] ensur[ing] that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983).

NEPA requires that federal agencies prepare an EIS. To fulfill the NEPA policy aims, agencies shall:

> include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—
>
> > (i) the environmental impact of the proposed action,
> >
> > (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
> >
> > (iii) alternatives to the proposed action,
> >
> > (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

> (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332(2)(C).

As an alternative to preparing an EIS, an agency may prepare a more limited Environmental Assessment ("EA") which includes a Finding of No Significant Impact, briefly stating why the action will not significantly impact the environment. *Dep't of Transp.*, 541 U.S. at 757–58. But if the EA does not lead to the conclusion that a Finding of No Significant Impact is warranted, the agency must still prepare an EIS. *Id.* at 757.

## B. Standard of Review

We review a district court's grant of summary judgment in NEPA cases *de novo*. *Northern Cheyenne Tribe v. Norton*, 503 F.3d 836, 845 (9th Cir. 2007). An agency's action "must be upheld unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.'" *Tri-Valley CAREs v. U.S. Dept. Of Energy*, 671 F.3d 1113, 1123 (9th Cir. 2012) (quoting 5 U.S.C. § 706(2)(A)). NEPA "does not mandate particular results but simply provides the necessary process to ensure that federal agencies take a hard look at the environmental consequences of their actions." *Id*. (quoting *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 814 (9th Cir. 1999)) (internal quotation marks omitted). We examine an EA "to determine whether it has adequately considered and elaborated the possible consequences of the proposed agency action when concluding that it will have no significant impact on the environment."

*San Luis Obispo Mothers for Peace v. Nuclear Regulatory Com'n*, 635 F.3d 1109, 1119 (9th Cir. 2011) (citing *Ctr. for Biological Diversity v. NHTSA*, 538 F.3d 1172, 1215 (9th Cir. 2008)).   We must consider "whether the EA fosters both informed   decision-making   and   informed   public participation." *Ctr. for Biological Diversity*, 538 F.3d at 1194 (citations omitted).

## C. Potential Terrorism Must Be Considered Under NEPA.

In *San Luis Obispo Mothers for Peace v. Nuclear Regulatory Commission*, the Nuclear Regulatory Commission ("NRC") argued that the construction of an installation for the on-site storage of spent nuclear fuel rods did not require the NRC "to consider the possibility of terrorist attacks" for the purposes of NEPA.   449 F.3d 1016, 1035 (9th Cir. 2006) ("*Mothers for Peace I*").   This court held that while "security considerations may permit or require modification of some . . . NEPA procedures," such modifications do not absolve an agency for its legal duty to fulfill NEPA's requirements, such as public contribution to the NRC's decision-making process. *Id*. at 1034.   We determined the NRC's categorical dismissal of the possibility of a terrorist attack was unreasonable and remanded for further proceedings.   *Id*. at 1030, 1035.

In the instant case, the Federal Defendants argue that our holding in *Mothers for Peace I* that terrorism must be considered under NEPA is inapplicable to the redevelopment of the Navy Broadway Complex.   While the Federal Defendants correctly state that the nuclear fuel storage facility at issue in *Mothers for Peace I* is not the same as the Navy Broadway Complex, the Coalition is correct that the

Navy Broadway Complex can hardly be classified as "everyday facilities" as the Federal Defendants assert.

The Navy Broadway Complex currently holds, and after redevelopment will continue to hold, major military commands coordinating "base operating support functions for operating forces throughout the region," as well as providing "logistics, business, and support services to . . . commands of the Navy[,] Coast Guard . . . and other joint and allied forces." The facility will be located in heavily-populated downtown San Diego "adjacent to the San Diego Bay waterfront" and "surrounded by a mix of urban uses," integrating hotels, commercial facilities, and public space into the Navy Broadway Complex site itself. As the Navy stated when providing a terrorism threat assessment for the 2009 EA, "a general threat exists in the U.S. from al Qa'ida and affiliated groups and individuals."

Given the government's assessed general risk of terrorism, the location of the redevelopment project, and the military commands to be housed in the Navy Broadway Complex, we reject the Federal Defendants' arguments against applying *Mothers for Peace I* and find that they must address the risk of a possible terrorist attack in their NEPA analysis.

## D. The 2009 EA Sufficiently Satisfies NEPA's Requirements.

The level of analysis provided by the Federal Defendants in the 2009 EA was sufficient to satisfy NEPA's requirements under *Mothers for Peace I*. After issuing a draft EA in September of 2008, the Navy held three public meetings and received numerous public comments related to the threat of

terrorism. The Navy responded to the comments and modified the 2009 EA to address the public's concerns regarding terrorism. Such constructive exchanges with the public demonstrate the "informed public participation" that NEPA requires. *See Ctr. for Biological Diversity*, 538 F.3d at 1194; *see also Save the Peaks Coal. v. Forest Serv.*, 669 F.3d 1025, 1037 n.5 (9th Cir. 2012) ("[C]ourts may consider responses to comments for confirmation that an agency has taken a 'hard look' at an issue.").

The Naval Criminal Investigative Service ("NCIS"), a security, counter-intelligence, counter-terrorism and law enforcement agency conducted the threat assessment on the proposed Navy Broadway Complex. Looking at national, regional, municipal, and specific threats to the Navy Broadway Complex, NCIS determined that "no known specific threat of a terrorist attack" existed. We believe that the Navy erred by including this reasoning in its analysis. The risks associated with terrorism are constantly in flux, and whether or not the intelligence community is aware of a *specific* threat to a facility at the time a NEPA analysis is conducted should have no bearing on whether to consider the impacts of an attack. Nevertheless, as explained below, we deem the Federal Defendants' NEPA analysis sufficient despite this erroneous finding.

The modified 2009 EA clearly explained the Navy's Anti-Terrorism Force Protection requirements and clarified that those requirements "would apply to all onsite buildings occupied either wholly or partially by [Department of Defense] personnel," provided such personnel meet a minimum occupancy rate in the building. The 2009 EA also incorporates by reference the Unified Facilities Criteria specifications for the Department of Defense's Minimum

Antiterrorism Standards for Buildings, UFC 4-010-01 ("Unified Facilities Criteria").[3]

A review of the Unified Facilities Criteria demonstrates that the Anti-Terrorism Force Protection requirements are based on an examination of plausible terrorist attack scenarios including attacks by explosives, vehicle bombs, waterborne vessel bombs, placed bombs, mail bombs, indirect fire, direct fire, as well as chemical, biological, and radiological weapons. UFC 4-010-01, DoD Minimum Antiterrorism Standards for Buildings (8 October 2003 as amended in 2007) Chapter 2, 3–4. The Unified Facilities Criteria mandates a planning process for the Navy Broadway Complex designed to ensure protection against terrorism and other security concerns by considering various "possible incidents or modes of attack" referred to by the Coalition's expert. *Id.* at Chapter 1, 2.

Further, the 2009 EA stated that antiterrorism building standards would "reduce the potential damage that could be inflicted by terrorist activity." And the complex would be limited to administrative functions and would not remain operational if subject to a terrorist attack. The Navy further concluded that the complex "would not jeopardize the national security of a military installation or the safety of our citizens" by virtue to its proximity to non-government buildings.

---

[3] The Department of Defense Minimum Antiterrorism Standards for Buildings, UFC 4-010-01, (8 October 2003 as amended in 2007) is available at http://wbdg.org/ccb/DOD/UFC/ARCHIVES/ufc_4_010_01 _2003.pdf (last checked February 29, 2016).

We are mindful of the Supreme Court's admonition against imposing additional procedures on an agency's NEPA decision-making process. *See Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 548–49 (1978). "The scope of an agency's inquiry must remain manageable if NEPA's goal of ensuring a fully informed and well considered decision is to be accomplished." *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 776 (1983) (citation and internal quotation marks omitted). Moreover "an agency [such as the Department of the Navy] must have the discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 378 (1989).

In sum, the Navy's 2009 EA identifies and incorporates by reference the Unified Facilities Criteria, which was made available to the public and explains the minimum antiterrorism force protection standards for public consideration. Further, "informed public participation" that included considerations of those antiterrorism force protection standards at the Navy Broadway Complex is evident in the record, in the public's participation in meetings, in the Navy's solicited public comments, and in the Navy's responses to those comments.

We are satisfied that the Navy's 2009 EA "foster[ed] both informed decision-making and informed public participation." *Ctr. for Biological Diversity*, 538 F.3d at 1194 (internal quotation marks omitted). The Navy could certainly have made the public's participation easier by including more specific information about the potential environmental effects of terrorism and by adding information from the Unified

Facilities Criteria in the 2009 EA itself to create a single, clear document. Nonetheless, the Federal Defendants' method of addressing those concerns can "reasonably be discerned." *Mothers for Peace II*, 635 F.3d at 1118. The Navy considered the relevant factors in its "hard look" at potential terrorism at the Navy Broadway Complex. The Federal Defendants did not abuse their discretion in determining that there was no significant impact from the possible environmental effects of potential terrorism at the Navy Broadway Complex, and a Supplemental Environmental Impact Statement is thus not required.

## CONCLUSION

Our precedent requires the Federal Defenders to consider the environmental impact of the Navy Broadway Complex's development, and to inform the public that they have considered environmental concerns in their decision-making process. We conclude that they have taken a hard look at the environmental consequences of their actions, and therefore fulfilled their obligations under NEPA.

**AFFIRMED.**

CARR, Senior District Judge, dissenting:

I agree that *San Luis Obispo Mothers for Peace v. Nuclear Regulatory Commission*, 449 F.3d 1016 (9th Cir. 2006), required the Federal Defendants to address the environmental consequences of a possible terrorist attack on the San Diego Navy Broadway Complex. But I respectfully

dissent from the majority's determination that the Federal Defendants adequately addressed those consequences.

The Naval Criminal Investigative Service determined there was "no known specific threat" of a terrorist attack at the Complex. For that reason, the Federal Defendants deemed the risk of such attacks "too speculative, remote and removed from the environmental effects of the proposed action to merit further analysis[.]"

That reasoning is deeply flawed, as the majority rightly observes. *Mothers for Peace* makes clear that "[t]he numeric probability of a specific attack is not required in order to assess likely modes of attack, weapons, and vulnerabilities of a facility, and the possible impact of each of these on the physical environment[.]" 449 F. 3d at 1031.

What is more, the Federal Defendants have not ruled out the possibility of a terrorist attack at the Complex. *Cf. Ground Zero Ctr. for Non-Violent Action v. U.S. Dep't of the Navy*, 383 F.3d 1082 (9th Cir. 2004) (Navy not required to consider environmental impact of accidental missile explosion, where Navy determined risk of such explosion "is between one in 100 million and one in 100 trillion"). Rather, they have acknowledged the "significant" risk of terrorism in the continental United States and identified "a wide variety of attack methods" terrorists are likely to employ. Accordingly, the Federal Defendants could have, and should have, considered the environmental impact of at least a few attack scenarios at the Complex.

I am mindful that the Federal Defendants revised the Environmental Assessment after receiving public comments about a potential terrorist attack at the Complex. But those

revisions only strengthened the Complex's defenses against a potential terrorist attack; they did not assess the likely environmental impact of such an attack.

For these reasons, I respectfully dissent.